316 P.2d 880

**L. E. CHERRY, Plaintiff-Appellant,**

v.

**T. B. WILLIAMS and W. L. Stroud, Defendants-Appellees.**

No. 6181.

Supreme Court of New Mexico.

Oct. 17, 1957.

See also 60 N.M. 93, 287 P.2d 987.

Dale B. Dilts, Albuquerque, for appellant.

J. L. Leftow, Lewis R. Sutin, Albuquerque, for appellees.

## LUJAN, Chief Justice.

This is an action to recover damages for an alleged false arrest and imprisonment against T. B. Williams and W. L. Stroud and for alleged malicious prosecution against T. B. Williams. The case was tried to a jury and from verdict and judgment entered in favor of T. B. Williams, defendant-appellee the plaintiff-appellant appeals. The cause of action against W. L. Stroud was dismissed by the court on motion made in his behalf.

At the time of the alleged false arrest and malicious prosecution T. B. Williams was the duly elected and acting mayor of the City of Hot Springs (Truth or Consequences) and W. L. Stroud was the duly appointed and acting Chief of Police of said city. They were not sued in their official capacity but as individuals.

The facts as revealed by the record are substantially as follows: In 1948 the City of Hot Springs, New Mexico, (now called Truth or Consequences) leased the race track property owned by it to a partnership consisting of H. C. Badger and Frank Herring. The lease is dated February 13, 1948 and purports to be for a term of ten years from date. It contains many provisions, the

violation of which authorizes a forfeiture at the election of the lessor. The partnership was operated under the firm name of Hot Springs Fair & Racing Association. Thereafter the plaintiff became a partner in said enterprise. Sometime later the partnership was incorporated under the same name and plaintiff was one of its stockholders. He was made manager and put in charge of the premises. He was also a concessionaire and operated a small restaurant therein. His living quarters were at the race track grounds.

On January 4, 1950, the City brought suit in the District Court of Sierra County seeking to cancel said lease. The case came to trial on February 19, 1951 and on March 8, 1951, judgment was rendered in favor of the city declaring the lease null and void. On April 4, 1951, an order was entered by the court granting an appeal to the Hot Springs Fair & Racing Association and fixing the amount of supersedeas bond. On the same day the bond was filed and approved by the clerk of the court. On April 22, 1952, City of Hot Springs v. Hot Springs Fair & Racing Ass'n, 56 N.M. 317, 243 P.2d 619 this court affirmed the judgment of the lower court.

Horne Brothers' Circus desiring to winter in the race track property contacted the Chamber of Commerce of said city and some members of the Sierra County Sheriff's posse for permission to winter therein. No arrangements had been made nor any agreement entered into for the use of the race track with either the city or the corporation in possession of the premises.

On October 18, 1950, the circus arrived at Hot Springs and the Sheriff's posse together with the police department escorted it into town and proceeded towards the race track. When the circus caravan reached the race track, the lead car left the highway and proceeded towards the race track gate but it was stopped by the plaintiff before it could enter. The remainder of the circus cortege remained stopped on the highway. At this time someone telephoned T. B. Williams and asked him to come down to the race track. Within a few minutes he arrived, and after viewing the situation called upon the plaintiff to allow the circus to proceed on its way into the race track but he refused to do so. Thereupon Williams called upon Stroud to arrest the plaintiff. As ordered, Stroud arrested him and took him to the police station where he was turned over to another officer. Plaintiff was detained at the police station for more than three hours until Williams arrived at which time the said Williams filed a complaint against him for resisting an officer. He was later released upon giving a bond in the sum of $500. On January 1, 1951, this complaint was dismissed by the City Magistrate.

Upon this appeal, plaintiff-appellant claims, that he had done no wrong which could have served as the basis for an arrest,

and that, therefore the arrest was illegal, because he had a right to defend his property. We find no merit to this claim.

■ If the conduct of the plaintiff at the time, appeared reasonably to the defendants, to amount to a disturbance of the peace, or to be otherwise unlawful in its nature, committed as it was in the presence of the Mayor and Chief of Police, then they were authorized to arrest the plaintiff without a warrant. Cave v. Cooley, 48 N.M. 478, 152 P.2d 886. That is exactly what they did, taking him into custody and transporting him to the police station, where a formal charge was filed against him.

Section 14-15-4 of 1953 Compilation among other things, provides, that the mayor of a city shall have and exercise within the city limits the power conferred upon the sheriffs of counties to suppress disorders and keep the peace.

Dr. Williams was called as an adverse witness by the plaintiff and testified as follows:

* * * * * *

"Q. Where did you see Mr. Cherry? Where was he with reference to the entrance to the property? A. He was on the right-of-way of Highway 85.

"Q. Was he near the big gate, the entrance? A. Yes. I would say he was midway between the gate and the paving.

* * * * * *

"Q. Now then, how far in from the highway does that gate or did that gate sit at that time? A. That gate would have set in roughly sixty feet.

* * * * * *

"Q. Well, now, was he on the highway or was he— A. (Interrupting) He was on the highway.

"Q. —in the fairgrounds property? A. No, he was on the U.S. Highway 85.

"Q. Was he on the slab or the paved part? A. He was off the paving.

* * * * * *

"Q. Now then, when you went down to this track and found this circus caravan there, you found that Mr. Cherry had stopped this caravan from entering upon the premises. That was the condition you found when you went down there? A. I found what I considered an acute hazardous condition on a national and international highway that was located within the confines of our city."

On direct examination he testified in his own behalf as follows:

* * * * * *

"Q. What did you observe when you arrived? A. I observed a conglomeration of vehicles and general pandemonium as far as the traffic situation was concerned.

"Q. Describe the conglomeration of vehicles in detail. What kind were they, and so forth? A. These vehicles were, when I saw the conglomeration, were those that go with a small circus. There were animal cages and rides and mostly everyone has seen the type of—they're small semi-trailers and some trucks.

"Q. Any house-trailers as part of the caravan? A. And several house-trailers, yes.

\* \* \* \* \* \*

"Q. And did you observe Mr. Cherry? A. Yes, I did.

"Q. Where was he? A. Mr. Cherry was standing in front of the lead vehicle.

"Q. Where was the lead vehicle? A. The lead vehicle was just off of the highway or just—it was just starting off the highway into the Fairgrounds gate.

\* \* \* \* \* \*

"Q. Was any part of that vehicle on the highway that you recall? A. Yes, I think some of it was protruding over.

"Q. And did you approach Mr. Cherry? A. Yes, I did.

"Q. Talk to him? A. Yes. I asked Mr. Cherry to let the caravan go on in.

"Q. What did he say? A. Well, he—I don't remember exactly what he said. He was adamant about doing anything because he was in an excited mood and we spent some time there trying to coax him, cajole him into letting the vehicles on in.

"Q. Did he permit the vehicles to go in? A. No, he did not.

"Q. Then what did you do? A. Then, when I saw he wasn't going to allow any remedy of the situation, I looked around for an officer and I found or saw Stroud, and I waved my arm for him to come over.

"Q. Did Stroud approach? A. Yes, Stroud came on over.

"Q. What did you tell Mr. Stroud? A. I told Mr. Stroud first to try to get him out of the way so we could clear up this traffic jam.

"Q. Did Mr. Stroud talk to Mr. Cherry? A. Yes. Mr. Stroud carried on a conversation with Mr. Cherry.

"Q. And did Mr. Cherry remove himself? A. No, he did not.

"Q. What did Stroud do? A. Then I told Stroud to arrest him.'"

On cross-examination he testified:

"Q. Now, Dr. Williams, the time you told Mr. Stroud to arrest Mr. Cherry, at the time that he did make the ar-

rest was that entirely because he was causing a traffic jam out there at the track? A. That was absolutely the only consideration.

"Q. And that's why you told Mr. Stroud to arrest him and get him out of there? A. Yes, sir.

\*　\*　\*　\*　\*　\*

"Q. Your only objective, the only reason, was to clear up that traffic? A. That was absolutely the only reason.

\*　\*　\*　\*　\*　\*

"Q. You say that you had him arrested because he was—? A. I had him arrested because he was obstructing traffic.

"Q. Are you sure that he was the one, Dr. Williams, who was obstructing the traffic? A. I am absolutely certain that he was.

\*　\*　\*　\*　\*　\*

"Q. What was he doing at that time, then? A. He was blocking the traffic.

\*　\*　\*　\*　\*　\*

"Q. Now, to what extent, just actually now, to what extent was that traffic snarled or blocked up there? A. It was, in my opinion, an acute traffic snarl."

Mr. Stroud testified on direct examination as follows:

\*　\*　\*　\*　\*　\*

"Q. Now, did you go over and see Mr. Cherry after you spoke to Dr. Williams? A. Yes, sir.

"Q. Did you say anything to him? A. I asked him to move.

"Q. Move where? A. Well, I just asked him to move; I don't recall whether it was once or twice.

"Q. What did he say? A. And he ignored me. I doubt he even knew I was talking to him; he was arguing with someone; I don't know who.

\*　\*　\*　\*　\*　\*

"Q. Then what did you do? A. Well, Dr. Williams then told me to place him under arrest, to arrest him.

"Q. Was that after you asked Cherry to remove himself? A. Yes, sir."

The claimed right of the plaintiff to defend his alleged property is wholly immaterial. The question is whether under the circumstances in this case the defendant Williams had probable cause to believe that a crime or misdemeanor was being committed in his presence. Cave v. Cooley, supra; Covertone v. Davies, 38 Cal.2d 315, 239 P.2d 876, certiorari denied Mock v. Davies, 344 U.S. 840, 73 S.Ct. 50, 97 L.Ed. 653. The foregoing facts were submitted to the jury and it obviously concluded that Williams had probable cause to order the arrest. We think the evidence was sufficient to form a basis for the verdict and we will not disturb the same.

The foregoing disposes of the basic part of the case. We have carefully examined plaintiff's further contentions relating to certain alleged erroneous instructions given by the court and also relating to the cause for malicious prosecution and we find them without merit.

Finding no reversible error, the judgment is affirmed.

It is so ordered.

SADLER, McGHEE, COMPTON and KIKER, JJ., concur.